[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10694
_____

D.C. Docket No. 2:05-cr-00119-MEF-CSC-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RICHARD SCRUSHY,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(July 15, 2013)

Before TJOFLAT and COX, Circuit Judges, and BOWEN,* District Judge.

TJOFLAT, Circuit Judge:

_____

* Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

On June 29, 2006, a Middle District of Alabama jury found Don Eugene Siegelman, a former Governor of Alabama, and Richard Scrushy, the founder and former Chief Executive Officer of HealthSouth Corporation, a major hospital corporation with operations throughout Alabama, guilty of federal funds bribery, in violation of 18 U.S.C. § 666(a)(1)(B); honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346; and conspiracy to commit the latter offenses, in violation of 18 U.S.C. § 371.[1]  We affirmed Scrushy's convictions and sentence and all but two of Siegelman's convictions in United States v. Siegelman (Siegelman I), 561 F.3d 1215 (11th Cir. 2009).  After it decided Skilling v. United States, 561 U.S. ---, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), the United States Supreme Court granted Scrushy and Siegelman's petition for writ of certiorari and remanded their cases to this court for reconsideration in light of Skilling.  On remand, we reversed two of Scrushy's §§ 1341 and 1346 convictions and remanded his case to the District Court for resentencing.  United States v. Siegelman (Siegelman II), 640 F.3d 1159 (11th Cir. 2011).  On January 25, 2012,

---

[1] Siegelman was also convicted of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

the court sentenced Scrushy to concurrent sentences totaling 70 months' imprisonment.[2]

Scrushy now appeals the District Court's judgment. The focus of his appeal is the District Court's denial of his motion for new trial filed on June 26, 2009, while Siegelman I was before the Supreme Court on certiorari, and the denial of his motion to recuse the trial judge, then Chief Judge Fuller,[3] filed the same day. We find no abuse of discretion in the challenged rulings and therefore affirm.

This case has had a convoluted history. To place the two rulings at issue here in context, it is necessary that we trace what transpired between the return of the jury's verdicts on June 29, 2006, and Scrushy's resentencing on January 25, 2012. In part I, we briefly describe the conduct that gave rise to Scrushy's convictions and recount the events that took place prior to the District Court's issuance of the rulings before us. In part II, we describe those rulings. Part III addresses Scrushy's arguments that the rulings constituted an abuse of discretion. Part IV concludes.

I.

---

[2] The court sentenced Siegelman to concurrent prison terms of 60 months on the § 371 conspiracy count and 70 months on the § 666(a)(1)(B) and §§ 1341 and 1346 substantive counts.

[3] Judge Mark E. Fuller's term as Chief Judge expired in 2011. For convenience, we refer to him as Judge Fuller.

Scrushy and Siegelman's bribery convictions were based on allegations that they made and executed a corrupt agreement whereby Scrushy gave Siegelman $500,000 in exchange for Siegelman's appointing him to Alabama's Certificate of Need Review Board. The honest services mail fraud convictions were based on the same bribery allegations, but also the allegation that Scrushy used the board seat he obtained from Siegelman to further HealthSouth's interests.

## A.

On September 29, 2006, following their convictions, Scrushy and Siegelman jointly moved the District Court for a new trial pursuant to Federal Rule of Criminal Procedure 33, asserting that they were denied a fair trial because of jury exposure to extrinsic evidence, jury misconduct, and news media coverage of the case.[4] The extrinsic evidence consisted of an unredacted copy of the second superseding indictment (on which the jury based its verdicts) obtained from the Middle District of Alabama courts' website and information from the same website describing the role of the jury foreperson. Juror #5, whose "affidavits" of August 9 and September 1, 2006, were attached to the defendants' motion, described the extrinsic evidence as including "Internet stuff and information" some of the jurors

---

[4] This is the only post-verdict motion the defendants filed jointly. Except as otherwise indicated, they separately and simultaneously thereafter filed essentially identical motions throughout the post-verdict litigation of the case.

4

"brought in," which was discussed along with the evidence in the case after the jury retired to deliberate its verdicts.[5]

The juror misconduct purportedly occurred when "at least three jurors engaged in one-on-one deliberations outside the presence of other jurors and, in doing so, discussed extrinsic evidence." Record, vol. I, no. 467, at 2–3. Defense counsel supported this allegation by attaching to their motion copies of four emails three jurors purportedly either sent to other jurors or received from other jurors during the trial.[6] These emails were mailed anonymously to defense counsel

---

[5] The jury retired to deliberate its verdicts on June 15, 2006, and returned its verdicts on June 29, 2006. The above quotations were taken from Juror #5's August 9 affidavit. That affidavit also stated that he regretted finding the defendants guilty. He attributed the verdicts to the pressure the jury was under. "The judge practically threatened us. He said that he was appointed for a lifetime to be a judge so he has all the time in the world. He said he had no problem holding us until next Fourth of July or however long it takes to reach a verdict." Mot. for New Trial Ex. 8, at 1, September 29, 2006, ECF No. 467-10. Also attached to the motion for a new trial were the affidavits of Juror #5's wife and their pastor, Stephen Hudson. The wife said that Juror #5 "told [her] that things were not handled right . . . from internet communications among the jury to the pressure and intimidation from the Judge." Mot. for New Trial Ex. 7, September 29, 2006, ECF No. 467-9. Hudson said that he had noticed "a drastic change" in Juror #5 since the conclusion of the trial. Mot. for New Trial Ex. 6, September 29, 2006, ECF No. 467-8.

[6] Defense counsel received copies of these emails by mail in an envelope postmarked September 5, 2006. The identity of the party who mailed the emails was not revealed. Scrushy refers to the jurors by letter in his motion for new trial; the court refers to the jurors by number. We refer to the sender and recipient of the email first by Scrushy's designation, then by the District Court's designation.

The first email, Exhibit 10, was sent by Juror B (Juror #40) to Juror C (Juror #7) on May 29, 2006, at 10:41 p.m. It stated, ". . . need to talk . . . . . !?" Mot. for New Trial Ex. 10, September 29, 2006, ECF No. 467-12. The second email, Exhibit 11, was sent from Juror B (Juror #40) to Juror C (Juror #7) on May 29, 2006, at 11:38 p.m. It stated, "I agree some of the kounts r confusing 2 our friends. Chek txt 30/38 still off trac." Mot. for New Trial Ex. 11, September 29, 2006, ECF No. 467-13. The third email, Exhibit 12, was sent from Juror D (it

5

following the trial.  On October 10, 2006, Scrushy's counsel received a fifth email, again from an anonymous person by mail.[7]

Judge Fuller held a hearing on the motion for a new trial on October 31.   He scheduled the hearing for the purpose of ascertaining the origin and authenticity of Juror #5's affidavits and determining whether defense counsel had violated Local Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases, which forbids contacting a juror for the purpose of inquiring into a jury verdict.[8]  Siegelman's counsel said that he

---

was unclear from the email address whether this email was sent by a juror) to Juror B (Juror #40) on June 25, 2006, at 11:28 p.m.  It stated, "penalty 2 severe . . . . still unclear on couple of counts against pastor & gov."  Mot. for New Trial Ex. 12, September 29, 2006, ECF No. 467-14.  The fourth email, Exhibit 13, was sent from Juror B (Juror #40) to Juror D (same address from third email) on June 25, 2006, at 11:48 p.m.  It stated, ". . . stay focused . . . .  remember what judge said . . . . have plans for 4[th] . . . . right?"  Mot. for New Trial Ex. 13, September 29, 2006, ECF No. 467-15.

It is unclear whether any of the eight juror emails cited in this opinion were sent in response to an email received by the juror.

[7]  This email was purportedly sent from Juror B (Juror #40) to Juror E (it was unclear from the email address whether this email was sent by a juror) on June 25, 2006, at 11:31 p.m.  It stated, "proud of you . . . other 6 kounts most important c.u.n..am."  Mot. for Expedited Consideration of an Order to Require Preservation of Evidence Ex. 15, October 11, 2006, ECF No. 472-1. Scrushy's counsel submitted the email to the District Court with a request that the court enter an order preserving the evidence.

[8]  Local Rule 47.1, Juror Information, Questionnaires and Contact, states, in subpart (b),

Attorneys, parties, anyone in their employ, or anyone acting for them or on their behalf shall not, without filing a formal motion therefor with the Court and securing the Court's permission, initiate any form of contact for the purpose of interrogating jurors or alternate jurors in civil or criminal cases, in any manner, in an attempt to determine what the jurors thought about any aspect of the case or evidence, the basis for any verdict rendered or to secure other information concerning the deliberations of the jury or any member thereof.

obtained Juror #5's affidavits this way:  Juror #5's pastor, Stephen Hudson, consulted a Birmingham, Alabama, pastor, Charles Winston, about Juror #5's difficulty after the trial coming to terms with his vote to find Scrushy and Siegelman guilty.  Winston and Juror #5 subsequently had a conversation in which Juror # 5 described what transpired during jury deliberations.  Winston prepared a document styled "Affidavit" for execution before a notary public.  The body of the document consisted of questions Winston posed to Juror #5 and Juror #5's answers.  The words were Winston's because Juror #5 did not read well.  Juror #5 signed the document on August 9, 2006, but not before a notary.  Winston then gave the document to his wife, Debra Bennett Winston, a lawyer, who noticed that Juror #5 had not signed the affidavit before a notary.

On a date between August 9 and September 1, 2006, Debra Winston met with one or more of Siegelman's lawyers and shared the information her husband had obtained from Juror #5.  On September 1, she prepared an affidavit for Juror #5's execution.  He signed it before a notary.  Like the August 9 affidavit, the September 1 affidavit is in question and answer form, with Juror #5 answering the questions Debra Winston asked him.  The answers closely resemble the answers he provided in the August 9 affidavit.  At some point between September 1 and September 29, when the motion for a new trial was filed, Debra Winston gave the affidavits to Siegelman's counsel.

7

After hearing the testimony of the Winstons, Juror #5, his wife, and Hudson, and considering Siegelman's attorney's representation concerning his acquisition of Juror #5's affidavits, Judge Fuller concluded that the evidence was insufficient to establish a Local Rule 47.1 violation and that the defendants had made a "colorable showing of extrinsic influence on the jury sufficient to warrant a further inquiry." Judge Fuller scheduled a hearing for November 17, 2006, so he could question the jurors.

At the November 17 hearing, Judge Fuller asked each juror whether, during the jury's deliberations, he or she had been exposed to or considered "extrinsic information." He explained that the extrinsic information consisted of the unredacted superseding indictment and the court's website information about the foreperson's role, but he did not mention the five emails. Most of the jurors recalled hearing about the unredacted superseding indictment and the information about the foreperson's role; several jurors also recalled that, during the trial, they had been exposed inadvertently to some media coverage of the case.

On December 13, 2006, Judge Fuller denied the motion for a new trial. As to the allegations of juror exposure to the extrinsic information, he found that even though there was credible evidence that jurors had been exposed to the unredacted second superseding indictment, information about the role of the foreperson, and media coverage of the case, the exposure to the extrinsic information was harmless

8

beyond a reasonable doubt.  United States v. Siegelman, 467 F. Supp. 2d 1253, 1278 (M.D. Ala. 2006).  As for the allegations of juror misconduct, Judge Fuller assumed that the five emails depicted by Scrushy as being sent by jurors to other jurors were authentic, but he nonetheless found that the exchange of the emails was not "of the sort into which this [c]ourt can or should directly inquire by interrogating jurors, nor is it in this [c]ourt's view grounds for granting a new trial."  Id. at 1280.

## B.

On December 21 and 22, 2006, two more emails surfaced.  These emails, purportedly sent by one of the jurors to another juror, indicated that jurors may have deliberated improperly.[9]  Copies of the emails were mailed anonymously to defense counsel and to co-workers of the two jurors in envelopes postmarked December 20, 2006.  The emails referenced "links" and "articles," indicating that

---

[9]  Both emails, Exhibits 23 and 24, were sent from Juror B (Juror #40) to Juror C (Juror #7) on June 25, 2006.   Exhibit 23, sent at 10:09 p.m., stated, ". . . judge really helping w/jurors . . . still having difficulties with # 30 . . . any ideas???  keeping pushing on ur side.  did not understand ur thoughts on statute but received links."  Mot. for Recons. Ex. 23, December 28, 2006, ECF No. 519-1.  Exhibit 24, sent at 10:41 p.m., stated,

> I can't see anything we miss'd.  u?  articles u sent outstanding!  gov & pastor up s--t creek.   good thing no one likes them anyway.  all public officials r scum; especially this 1. pastor is reall a piece of work . . . they missed before, but we won't . . . also, keepworking on 30 . . . will update u on other meeting.

> Mot. for Recons. Ex. 24, December 28, 2006, ECF No. 519-2.

the jurors had considered extrinsic information on the merits of the case. The co-workers gave the two jurors the emails they had received; one of the jurors reported receiving the emails to the U.S. Marshals Service (the "Marshals"), and the other reported the event to the court.[10] The Marshals then informed Judge Fuller of the emails because he presided over the trial of the case and was the Middle District of Alabama's chief judge. Judge Fuller asked the Marshals to investigate the matter. The Marshals, in turn, went to the acting U.S. Attorney, who asked the U.S. Postal Inspection Service (the "Postal Service") to join in the investigation.[11] The acting U.S. Attorney, Louis Franklin, assigned an Assistant U.S. Attorney to oversee the investigation. Scrushy and his lawyers were not informed of these events.

On December 28, 2006, about a week after the two additional emails came to light, Scrushy moved the court to reconsider its order denying his motion for a new trial or, in the alternative, to grant him a new trial based on newly discovered evidence. Scrushy argued that the two new emails, if authentic, showed that jurors had conducted far more extensive Internet research than previously admitted and that the information they found was "not only damning to Defendant Scrushy, but

---

[10] The record does not indicate whether the juror went to the court's clerk's office or directly to Judge Fuller.

[11] Since the U.S. Mails were involved, the Postal Service was the federal law enforcement agency with jurisdiction to investigate the matter.

10

that it appears to be related to the prior high-profile trial of Defendant Scrushy on other criminal charges, where he was acquitted of all charges." Record, vol. II, no. 519, at 9. Scrushy asked the court to summon the jurors to court for further questioning.

On February 21, 2007, Scrushy and his lawyer each received through the mail from an anonymous sender an email purportedly sent by the juror who received the two emails contained in the envelope postmarked December 20, 2006, to the juror who purportedly sent the two emails.[12] On February 26, 2007, Scrushy filed a motion to supplement his motion for reconsideration, attaching the email as an exhibit.

In early April 2007, while the alternative motions were pending, the Marshals met with Judge Fuller and told him that the Postal Service had concluded that the two emails the jurors' co-workers had received on December 21 and 22 were not authentic but that they had not determined who sent them.[13] Scrushy and his lawyers were unaware of the meeting. On June 22, 2007, Judge Fuller denied Scrushy's motion for reconsideration. He also denied Scrushy's alternative motion

---

[12] Juror C (Juror #7) purportedly sent the email to Juror B (Juror #40) on June 25, 2006, at 10:47 p.m. It stated, "Great info 4 r friends. % of prosecution increases dramatically. Could not find that when I surfed it. Gov/Pastor GONE." Mot. to Supplement Previously Filed Mot. to Recons. Ex. 26, February 26, 2007, ECF No. 532-1.

[13] It does not appear that the email Scrushy attached to his February 26, 2007, motion to supplement was given to the Marshals and the Postal Service.

for a new trial.  As he had done with the five emails presented with the defendants'
September 29, 2006, motion for a new trial, he treated the emails contained in the
envelopes marked December 20, 2006, and the email Scrushy and his lawyer
received on February 21, 2007 ("the three emails") as authentic and concluded that
they were merely "cumulative" of the five emails that had surfaced earlier.
Moreover, on November 17, 2006, the jurors had already testified under oath about
their possible contact with extraneous information, and the questions put to them at
that time had been sufficiently broad to satisfy the requirements of law.  United
States v. Siegelman, 2007 WL 1821291, at *5 (M.D. Ala. June 22, 2007).

Six days after denying Scrushy's alternative motions, the District Court
sentenced the defendants.  The court sentenced Siegelman to prison for terms
totaling eighty-eight months and Scrushy to terms totaling eighty-two months.

C.

Scrushy and Siegelman appealed their convictions and sentences on July 11,
2007.  In addition to challenging the sufficiency of the evidence to convict, they
challenged the District Court's denial of their joint motion for a new trial (on
December 13, 2006) and its denial of their motions for reconsideration (on June 22,
2007).  At the time they filed their notices of appeal, they were still unaware of the
April 2007 meeting between Judge Fuller and the Marshals.  Their attorneys
became aware of the meeting, however, when they received a letter, dated July 8,

12

2008, from the chief of the Appellate Section of the Criminal Division of the U. S.

Department of Justice.  The letter explained that, while preparing its answer brief

in response to Scrushy's opening brief, the Government had become aware of the

meeting, and the investigation that led to it, and that defense counsel were being

notified of the same out of an "abundance of caution."  Record, vol. III, no. 954-1,

at 4.  The letter stated the following:

> On or about December 21, 2006, at least five co-workers of Jurors 7 and 40
> received in the United States mail at their places of employment copies of
> purported emails identical to the ones appended to defendant Scrushy's
> Motion to Reconsider filed on December 28, 2006.  Like the envelopes
> received by defense counsel, the envelopes did not bear a return address,
> were postmarked December 20, 2006, and were sent from Montgomery,
> Alabama. After the recipients showed the purported emails and envelopes to
> Jurors 7 and 40, the jurors notified the United States Marshals Service.
> (Juror 7 initially reported the mailings to the court, but the court referred him
> to the Marshals Service.)  The Marshals Service brought the mailings to the
> attention of Acting United States Attorney Louis Franklin, who asked the
> Postal Inspectors to attempt to determine who had sent the letters to the
> jurors' co-workers.  Shortly thereafter, Mr. Franklin transferred oversight of
> the investigation to an attorney in his office who was not involved in the
> prosecution of defendants.
>
> Over the next several weeks, a Postal Inspector interviewed Jurors 7 and 40
> and some of the co-workers who had received in the United States mail
> copies of the purported emails.  The Postal Inspector also compared the
> purported emails to test emails sent from and received by Juror 40's email
> account.  Based on a comparison of the emails and information obtained
> from the jurors and their co-workers, including information from a co-
> worker of Juror 7 who monitored Juror 7's emails during trial and did not
> see any incoming emails from Juror 40, the Postal Inspector concluded that
> the purported emails were not authentic and had been forged.  Although the
> Postal Inspector subsequently submitted the stamped envelopes and

13

purported emails for forensic examination, the results were inconclusive.  He closed his investigation on September 10, 2007.  No charges were brought.

[I]n early April 2007, . . . representatives of the United States Marshals Service apprised Chief Judge Fuller that the Postal Inspectors were investigating the receipt of purported emails by co-workers of the two jurors and had concluded that the purported emails were not authentic, but that the Postal Inspectors had not determined who had sent copies of the emails to the co-workers.  The Marshals who spoke to Chief Judge Fuller have advised us that the Chief Judge did not solicit this report.

Record, vol. III, no. 954-1, at 3–4 (emphasis added).

After receiving this letter, Scrushy moved this court to appoint a special master pursuant to Federal Rule of Appellate Procedure 48 to investigate the authenticity of the three emails.[14]  Then, in his reply brief (filed in response to the Government's answer brief), he argued that this court should remand the case to the District Court for an evidentiary hearing, so that the Marshals could state under oath, subject to cross-examination, what they said to Judge Fuller at their April 2007 meeting.[15]  He also argued that contrary to what Judge Fuller stated in the

---

[14]  Siegelman did not also move the court for the appointment of a special master.

[15]  Ordinarily, as a prudential rule, this court does not consider issues an appellant raises initially in his reply brief.  See, e.g., United States v. Levy, 379 F.3d 1241, 1242 (11th Cir. 2004).  Because Scrushy was not informed of the Marshals meeting with Judge Fuller until he received the July 8, 2008, letter from the Department of Justice, the Siegelman I panel did not invoke the prudential rule and, instead, considered and ruled on the meeting issue although sub silentio.

14

June 22, 2007, order denying his motion for reconsideration, Judge Fuller had not assumed the authenticity of the three emails. [16]

### D.

This court decided Siegelman I on March 6, 2009. In affirming Scrushy's convictions and sentences, and Siegelman's convictions in part,[17] the panel found no abuse of discretion in the District Court's denial of the motion for a new trial on December 13, 2006, and the motion for reconsideration on June 22, 2007.

Addressing the December 13 decision, the panel agreed with the District Court that the jurors' exposure to the extrinsic information—the unredacted second superceding indictment and the information about the role of the jury foreperson—and the news media coverage of the case was harmless. As for the five emails supposedly sent by jurors to other jurors either before or during the jury's deliberation,[18] the panel rejected the argument that the emails evidenced "that there was both premature jury deliberations and deliberation by fewer than all the jurors in this case, and that this improper deliberation denied the defendants of their Sixth

---

[16] Siegelman's reply brief contained the same arguments.

[17] Siegelman's convictions on two counts of honest services mail fraud were reversed, his sentences were vacated, and his case was remanded for resentencing. Siegelman I, 561 F.3d at 1245.

[18] As indicated supra, there were eight emails in all: five surfaced prior to the District Court's November 17, 2006, hearing; two surfaced on December 21–22, 2006; and one surfaced on February 21, 2007. Two of the emails were sent on May 29, 2006, before the jury retired to deliberate its verdicts on June 15, 2006; the other six were sent on June 25, 2006, during the deliberation.

Amendment right to an impartial jury." Siegelman I, 561 F.3d at 1240. The panel did so because all that the emails indicated was that the jurors might have deliberated prematurely and thus contrary to the court's instructions. Whether two or more jurors actually deliberated prematurely—prior to June 15, 2006, when the jury retired to deliberate—and did so in a way that effectively denied the defendants their right to a trial by jury could not be determined unless the court examined the jurors under oath. The court had "serious reservations" about the authenticity of the five emails. It assumed, however, that they were authentic and concluded that "the law barred it from questioning the jurors about their deliberations, or about the emails purporting to suggest that the jurors deliberated improperly." Id. at 1242. The court drew the same conclusion about the three emails that surfaced after it issued its December 13 decision. It assumed the emails were authentic and then held that it would be inappropriate to summon the jurors to the courthouse a second time to subject them to further inquiry. The panel agreed, and therefore denied Scrushy's motion for the appointment of a special master to determine the authenticity of the three emails. Siegelman I, 561 F.3d at 1237 n. 26.

E.

After the decision in Siegelman I issued, the Supreme Court decided Skilling v. United States, 561 U.S. ---, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), in which

16

it held that the honest services mail fraud statutes were only intended to reach schemes involving bribery or kickbacks. The Court vacated Siegelman I on June 29, 2010, and remanded the case for consideration in light of Skilling. On remand, this court reversed Scrushy's convictions on two of the honest services mail fraud counts because they were based on a self-dealing theory of honest services fraud that could no longer support a conviction after Skilling. United States v. Siegelman (Siegelman II), 640 F.3d 1159, 1177 (11th Cir. 2011). The part of the Siegelman I decision addressing the alleged juror misconduct remained unchanged.

On January 25, 2012, on receipt of this court's mandate, Judge Fuller resentenced Scrushy.

II.

The motions at issue in this appeal—Scrushy's motions for a new trial and for the recusal of Judge Fuller—were filed on June 26, 2009, after Siegelman I was decided and before the Supreme Court issued its decision on June 24, 2010.[19] The motion for a new trial was filed pursuant to Federal Rule of Criminal Procedure 33(b)(1), which requires that a motion for a new trial based on newly discovered

---

[19] Siegelman moved the court to allow him to join in Scrushy's motion to recuse on October 7, 2009. Judge Fuller entered an order granting his request on October 15, 2009.

17

evidence be filed within three years after the jury returns its verdict of guilty.[20]

Scrushy sought a new trial on six grounds,[21] five of which are before the court in this appeal: (1) his was a "selective prosecution" in violation of the equal protection component of the Fifth Amendment Due Process Clause; (2) the three emails dealt with in Judge Fuller's June 22, 2007, order denying his motion for reconsideration (of the December 13, 2006, decision denying a new trial) were authentic and evidenced that jurors prematurely and improperly deliberated and therefore denied his right to a trial before an impartial jury; (3) Judge Fuller, in meeting ex parte with the Marshals, "violat[ed] . . . the Code of Conduct for United States Judges, and deprived [Scrushy] of his Sixth Amendment Right to effective assistance of counsel and his Fifth Amendment right to due process"[22]; (4) U.S.

---

[20] As indicated supra, the jury returned its verdicts against Scrushy (and Siegelman) on June 29, 2006.

[21] Scrushy's motion explicitly asserted five grounds. Parsing the motion, we read it to assert six grounds.

[22] Scrushy alleged that

to determine the full extent of the prejudice he suffered, it will be necessary for Defendant to have access to investigative reports and interviews of the Postal Inspectors (identities unknown to Defendant), and a transcript of the ex parte meeting between the Marshals and the Chief Judge (if one exists) or, if no transcript exists, the testimony of the U.S. Marshals (identities unknown) and the testimony of Chief Judge Fuller. Defendant also submits that he should be provided with testimony or affidavits necessary to determine if other ex parte meetings occurred with the Chief Judge, and if so, either the transcripts of such meetings or, in the alternative, the testimony of all participants in any such meetings or communications.

18

Attorney Leura Canary's failure to adhere to her unilateral decision to recuse deprived him of a disinterested prosecutor;[23] and (5) the prosecution effectively denied Scrushy an impartial jury in failing to inform him of juror infatuation with the FBI's case agent.

The motion for recusal asserted two grounds.  First, 28 U.S.C. § 455(a)[24] required Judge Fuller to recuse because an objective disinterested lay observer, knowing that he had met with the Marshals ex parte, would entertain significant doubt as to his impartiality.  Second, 28 U.S.C. § 455(b)[25] required Judge Fuller to recuse because, in meeting with the Marshals, he acquired personal knowledge of

Record, vol. II, no. 953, at 15.

[23]  Canary voluntarily recused on May 16, 2002, while the case against Siegelman and Scrushy was under investigation, after Siegelman's lawyer wrote to the U.S. Deputy Attorney General requesting her disqualification.  Counsel's request was based on an allegation of conflict of interest because Canary's husband, William J. Canary, was a paid consultant for political campaigns of Republican opponents of Siegelman.  Louis Franklin Sr. was appointed acting U.S. Attorney for the case in January 2003, after the retirement of Charles Niven, who became acting U. S. Attorney following Canary's recusal.

[24] Section 455(a) of Title 28 of the United States Code reads:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

[25] Section 455(b) of Title 28 of the United States Code provides in relevant part:

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . .

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

19

disputed evidentiary facts and was likely to be a material witness in the proceeding.

We turn first to the District Court's handling of the motion to recuse, then to the motion for a new trial.

## A.

Judge Fuller asked the Chief Judge of the Eleventh Circuit to appoint a judge to hear and decide the motion to recuse, and the Chief Judge appointed Judge Robert Hinkle of the Northern District of Florida. Judge Hinkle denied the motion in an order entered on June 29, 2011. He did so after a thorough study of the record—from the commencement of the case through this court's decision in Siegelman II and the filing of the motions to recuse and for a new trial on June 26, 2009. We turn first to Judge Hinkle's conclusion that the record established no basis for recusal under § 455(a).

## 1.

After the Marshals informed Judge Fuller of the emails co-workers of two jurors had received in the mail, he asked the Marshals to investigate the matter.[26]

---

[26] Shortly thereafter, on December 28, 2006, Scrushy moved the District Court to reconsider its December 13, 2006, order denying his motion for a new trial and attached to the motion copies of the two emails.

The Marshals immediately contacted the acting U.S. Attorney, who asked the Postal Service join in the investigation.

Three and a half months later, in April 2007, the Marshals met with Judge Fuller ex parte and told him that the Postal Service had determined that the emails were not authentic but was unable to identify the person who sent them. Scrushy contends that Judge Fuller's ex parte meeting with the Marshals, standing alone, rendered his impartiality questionable as a matter of law.

Judge Hinkle found nothing improper about Judge Fuller's meeting with the Marshals ex parte and no cause for recusal under § 455(a). What transpired in this case—the Marshals informing the trial judge that one or more jurors may have engaged in conduct contemptuous of the court's instructions to the jury—is not an infrequent occurrence in the district courts. And Judge Fuller handled it in much the same manner most district judges would—even where, as here, the case was still ongoing before the judge. After reviewing the law of the Eleventh Circuit counseling what a district judge should do on receiving extrinsic information relating to a pending case, its parties, or its witnesses, Judge Hinkle concluded that Judge Fuller's meeting with the Marshals to receive the report of their investigation did not automatically disqualify him from continuing with the case. In sum, the ex parte meeting with the Marshals for such purpose would not lead an

21

objective disinterested lay observer to entertain significant doubt about the judge's impartiality.

2.

Scrushy contended that Judge Fuller had to recuse under § 455(b) because he acquired from the Marshals personal knowledge about a disputed evidentiary fact—the authenticity of the three emails—underlying the second ground of the motion for a new trial pending before him.  The problem with this contention, as Judge Hinkle saw it, was that Judge Fuller resolved the authenticity issue in Scrushy's favor by assuming that the emails were not forged, but, instead, were authentic.  Judge Fuller did not have to recuse because, in the words of § 455(b), he did not have "personal knowledge of disputed evidentiary facts" concerning the proceeding, nor was he likely to be a "material witness."  See 28 U.S.C. § 455(b).  Judge Hinkle also noted, correctly, that the Siegelman II decision had foreclosed this ground of recusal.

B.

With Judge Hinkle having disposed of the recusal issues, Judge Fuller turned to Scrushy's motion for a new trial.  Scrushy insisted that the court could not rule on his motion without affording him an opportunity to engage in the discovery he said he needed to establish the grounds of his motion.  Scrushy represented that the necessary discovery was in the hands of the Government.  He therefore moved the

22

court to require the Government to produce the following documents and

information as relating to grounds (1), (3), (4), and (5) of his motion for a new

trial.

      I.      Requests Relating to Issue [1] (Selective Prosecution)

1. The Prosecution Memorandum from the U.S. Attorney's Office for the Middle District of Alabama to both the Public Integrity Section and the Organized Crime and Racketeering Section ("OCRS"), including all updates and amendments to either document.
2. Case Map analysis showing progression of the investigation.
3. All reports, notes, memoranda, documents, e-mails and writings of any kind relating to the decision in or about 2004 to "take a fresh look at the case from top to bottom."
4. All reports, notes, memoranda, documents, e-mails and writings of any kind touching upon the investigation of Defendants Scrushy or Siegelman by, to, or from: Alberto Gonzalez (Attorney General or Legal Counsel to the President); Karl Rove (Special Assistant to the President); Noel Hillman (Chief, Public Integrity Section); William M. Welch II (Chief, Public Integrity Section); Brenda Morris (Principal Deputy Chief, Public Integrity Section); Andrew Lourie (Acting Chief, Public Integrity Section); Richard Pilger (Attorney, Public Integrity Section); and personnel in OCRS.
5. All reports, notes, memoranda, documents, e-mails and writings of any kind in the possession of the Office of Professional Responsibility and the Executive Office for the United States Attorneys and/or the Department of Justice itself which contain any evidence of any kind which support the conclusion that the decision to investigate and/or prosecute either Defendant Siegelman or Defendant Scrushy was based on political considerations or political pressure of any kind, or support the conclusion that Defendants were victims of selective prosecution.
6. All reports, notes, memoranda, documents, e-mails and writings of any kind relating in any way to the investigation of or decision not to investigate the allegations of illegal campaign contributions arranged by Lanny Young to either Senator Jeff Sessions or then-Attorney General Bill Pryor.

7. All reports, notes, memoranda, documents, e-mails and writings of any kind relating to the decision to reject the negotiated plea arrangement relating to Defendant Scrushy.

II. Requests Relating to Issue [3] (Ex Parte Meeting Between Judge and Government

1. All reports of interviews, investigative reports, notes, memoranda, documents, e-mails or writings of any kind which were generated or obtained by the Postal Inspectors in the course of that agency's investigation of the copies of e-mails mailed to co-workers of Jurors 7 and 40.
2. All reports, notes, memoranda, documents, e-mails and writings of any kind by the U.S. Attorney's Office (a) requesting, directing or authorizing the above investigation by the Postal Inspectors; or (b) seeking authorization from Chief Judge Fuller to interview jurors in the instant case or to reveal jurors' names.
3. All reports, notes, memoranda, documents, e-mails and writings of any kind that were shown or provided to Chief Judge Fuller relating to the above investigation by the Postal Inspectors.
4. All reports, notes, memoranda, documents, e-mails, transcripts, and writings of any kind reflecting the ex parte meeting between Chief Judge Fuller and the U.S. Marshals in or about April 2007 concerning the above investigation by the Postal Inspectors.
5. The names and contact information for all individuals who were present or knew of the ex parte meeting described in the preceding paragraph.
6. All transcripts, reports, notes, memoranda, documents, e-mails and writings of any kind reflecting any additional ex parte meetings between Chief Judge Fuller and any current or former federal or state employee relating in any way to the prosecution of Defendants Scrushy or Siegelman, or post-trial proceedings related to this case.
7. Any documents that the Appellate Section of the Department of Justice relied on or reviewed which contributed or influenced in any way to its decision to issue the July 8, 2008, letter by Patty Merkamp Stemler, Chief of the Appellate Section, Department of Justice, and any e-mails, memoranda or documents of any kind reflecting the decision-making process to issue that letter.

24

8. All reports, notes, memoranda, documents, e-mails and writings of any kind in the possession of the Government reflecting any follow-up investigations, inquiries or interviews concerning the April 2007 ex parte meeting between the U.S. Marshals and Chief Judge Fuller.

III.    Requests Relating to Issue [4] (U.S. Attorney Recusal)

1. All reports, notes, memoranda, documents, e-mails and writings of any kind by or from U.S. Attorney Leura Canary on or after May 16, 2002 to any lawyer, law enforcement agent, paralegal or other employee or contract employee or former employee of the U.S. Attorney's Office for the Middle District of Alabama, the Department of Justice, or the Alabama Attorney General's Office that touches in any way on any aspect of the investigation or prosecution of Defendants Scrushy or Siegelman or any post conviction proceedings in that case.

2. All reports, notes, memoranda, documents, e-mails and writings of any kind from any lawyer, law enforcement agent, paralegal or other employee or contract employee or former employee of the U.S. Attorney's Office for the Middle District of Alabama, the Department of Justice, or the Alabama Attorney General's office on or after May 16, 2002, written or provided to U.S. Attorney Leura Canary that touches in any way on any aspect of the investigation or prosecution of Defendants Scrushy and Siegelman or any post conviction proceedings in that case.

IV.    Requests relating to Issue [5] (Prosecutorial Misconduct)

1. All e-mails, memoranda or documents of any kind to or from any lawyer, law enforcement agent, paralegal or other employee or contract employee or former employee of the U.S. Attorney's Office, the Department of Justice, or the Alabama Attorney General's office touching in any way on any member of the trial jury in the instant case (or speculating on any contacts to, from or with said jurors), as well as any knowledge or information concerning any contacts with or by jurors or speculation that such contacts may or did occur which has not been reduced to writing, along with the name and contact information of any individual having such knowledge or information.

25

Record, vol. III, no. 955, at 3–6.

Judge Fuller referred Scrushy's motion for production to a Magistrate Judge for a report and recommendation on whether any of the requested discovery was needed to decide any of the grounds for a new trial and thus should be made available to Scrushy's counsel. The Magistrate Judge ordered the Government to produce the discovery in camera. The Government complied. After examining the discovery, he concluded that none of it supported any of Scrushy's grounds for a new trial. He therefore denied Scrushy's motion for discovery.

Scrushy appealed the Magistrate Judge's discovery decision to the District Court, arguing that the Magistrate Judge erred in concluding that the discovery provided no support for his motion for a new trial. Judge Fuller rejected Scrushy's argument and denied his motion. Without saying so explicitly, the Magistrate Judge, and thus Judge Fuller, found Scrushy's grounds for a new trial facially insufficient as a matter of law.

In subsequently ruling on the merits of Scrushy's motion for new trial, Judge Fuller expressly found no merit in grounds (1), (4), and (5), and by implication found no merit in ground (2). As for ground (3)—that Judge Fuller violated the Codes of Judicial Conduct and denied Scrushy his Sixth Amendment right to counsel and due process of law in meeting ex parte with the Marshals—Judge Fuller relied in large part on Judge Hinkle's order denying the motion to recuse.

26

He concluded that "the arguments before Judge Hinkle on the motion to recuse are identical to those presently before this Court.  For the reasons stated, including the depth of Judge Hinkle's analysis and the soundness of his conclusions, the Court finds no reason to revisit issues that have already been decided."  United States v. Scrushy, 2012 WL 204159, at *7 (M.D. Ala. Jan. 24, 2012).

## III.

As we indicated at the outset, this appeal focuses on the District Court's disposition of two motions Scrushy filed on June 26, 2009, a motion to recuse Judge Fuller and a motion for a new trial.  We review for abuse of discretion a district court's denial of a motion to recuse, In re Walker, 532 F.3d 1304, 1308 (11th Cir. 2008) (citing Christo v. Padgett, 223 F.3d 1324, 1333 (11th Cir. 2000), and a motion for a new trial, United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005) (citing Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004)).  "A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous."  Goodman-Gable-Gould Co. v. Tiara Condominium Ass'n, Inc., 595 F.3d 1203, 1210 (11th Cir. 2010) (quoting Arce v. Garcia, 434 F.3d 1254, 1260 (11th Cir. 2006).

27

We find no abuse of discretion in Judge Hinkle's handling of the motion to recuse or in Judge Fuller's handling of the motion for new trial. We consider in sequence the denial of the two motions.[27]

### A.

A party may move for the recusal of a judge under 28 U.S.C. § 455. The statute sets out two situations in which recusal is required. Section (a) provides that recusal is necessary where a judge's impartiality may reasonably be questioned. 28 U.S.C. § 455(a) (2006) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."). The standard of review is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." United States v. Patti, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting Parker v. Connors Steel Co., 855 F.2d 1510, 1524 (11th Cir. 1988)). The standard is thus an objective one, "designed to promote the public's confidence in the impartiality and integrity of the judicial process." In re

---

[27] In affirming the District Court's denial of Scrushy's motion for a new trial, we also affirm, without discussion, the court's rejection of Scrushy's objection to the Magistrate Judge's refusal to permit discovery of the documents the Government had produced in camera and his denial of an evidentiary hearing regarding the documents' contents.

Evergreen Sec., Ltd., 570 F.3d 1257, 1263 (11th Cir. 2009) (quoting Davis v. Jones, 506 F.3d 1325, 1332 n.12 (11th Cir. 2007)).

Section (b) lists several circumstances requiring recusal, including "[w]here [the judge] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding,"  28 U.S.C. § 455(b)(1), and where the judge is "likely to be a material witness in the proceeding," 28 U.S.C. § 455(b)(5)(iv).  In those circumstances, partiality is conclusively presumed, making recusal mandatory because "the potential for conflicts of interest are readily apparent."  Patti, 337 F.3d at 1321 (quoting Murray v. Scott, 253 F.3d 1308, 1312 (11th Cir. 2001)).

Scrushy's motion sought Judge Fuller's recusal from hearing the pending motion for new trial for two reasons:  (1) § 455(a) required Judge Fuller to step down because he met ex parte with the Marshals about a factual issue created by the second ground of his motion for a new trial—whether the three emails were authentic—and therefore cast doubt on his impartiality, and (2) § 455(b) required recusal because, at the meeting, Judge Fuller learned that the Postal Service had concluded that the emails were not authentic and thus acquired personal knowledge of a disputed evidentiary fact central to that second ground.  Judge Fuller would be a material witness in the adjudication of that ground.

29

Scrushy contends that Judge Hinkle abused his discretion in failing to uphold these two grounds. We are not persuaded. As for ground (1), Scrushy ignores the fact that Judge Fuller assumed the authenticity of the three emails in denying his December 28, 2006, motion for reconsideration based on the emails. Put plainly, he resolved the disputed factual issue in Scrushy's favor and against the federal prosecutor. It would defy common sense to conclude that a disinterested lay observer would doubt Judge Fuller's impartiality—that the observer would think that Judge Fuller, in resolving the issue in Scrushy's favor, was somehow partial to Scrushy's adversary, the federal prosecutor, and thus would likely be partial in deciding Scrushy's motion for a new trial.

As for ground (2), Judge Fuller disregarded any knowledge gained in the ex parte meeting with the Marshals and assumed what Scrushy urged him to find, that the emails were authentic. Because he resolved the factual dispute in Scrushy's favor—and Siegleman I accepted that resolution in affirming his denial of Scrushy's motion for reconsideration—the authenticity of the emails was no longer at issue, and Judge Fuller was not likely to be a material witness in any proceeding.

Having found no abuse of discretion in Judge Hinkle's denial of Scrushy's motion to recuse, we turn to Judge Fuller's denial of Scrushy's motion for a new trial.

30

B.

Rule 33 provides that motions for a new trial based on newly discovered evidence must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1).[28] "Motions for a new trial . . . are highly disfavored in the Eleventh Circuit and should be granted only with great caution." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006). "Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of law." Id. (internal quotation marks and citations omitted). Questions regarding the "fairness or impartiality of a jury" may be grounds for a new trial based on newly discovered evidence, id., as may evidence that would "afford reasonable grounds to question . . . the integrity of the verdict." United States v. Williams, 613 F.2d 573, 575 (5th Cir. 1980).[29]

To obtain a new trial under Rule 33(b)(1), "a movant must satisfy four elements: (1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it would probably

---

[28] Motions for a new trial based on any other grounds must be filed within fourteen days of the verdict. Fed. R. Crim. P. 33(b)(2).

[29] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of due diligence on the part of the defendant." United States v. Espinosa-Hernandez, 918 F.2d 911, 913 n.5 (11th Cir. 1990).

As indicated, supra, five of the six grounds Scrushy relied on in seeking a new trial are before us in this appeal. We review them in order, starting with his claim that he was subjected to selective prosecution in violation of his Fifth Amendment right to the equal protection of the law.[30]

### 1.

The Fifth Amendment's Due Process Clause has an equal protection component akin to the Equal Protection Clause of the Fourteenth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S. Ct. 693, 694–695, 98 L. Ed. 884 (1954). It prohibits the federal government from denying to any person in the United States the equal protection of the laws. Scrushy seeks the vacation of his convictions, and perhaps a judgment of acquittal, on the ground that the Government denied him equal protection in prosecuting him for the crimes contained in the second superseding indictment.

---

[30] Scrushy argues that Judge Fuller abused his discretion in denying his motion for a new trial without an evidentiary hearing. An evidentiary hearing was not required because the record contained all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial.

32

Scrushy was indicted because he contributed $500,000 to an issue-advocacy campaign supported by then-Governor Siegelman and, in return, received an appointment to Alabama's Certificate of Need Review Board.  His prosecution was selective, he says, because other similarly situated people made campaign donations and received gubernatorial appointments but were not prosecuted.

Scrushy's selective prosecution claim fails for two reasons.  First, a claim of selective prosecution is not the proper subject of a Rule 33(b)(1) motion for a new trial.  Selective prosecution has "no bearing on the determination of factual guilt." United States v. Jones, 52 F.3d 924, 927 (11th Cir. 1995) (citing United States v. Jennings, 991 F.2d 725, 730 (11th Cir. 1993)).  Whether the decision to prosecute Scrushy was motivated by improper reasons has no bearing on the integrity of the trial or the verdict and is therefore not the proper subject of a Rule 33(b)(1) motion.

Second, a claim of selective prosecution alleges a defect in the institution of prosecution under Federal Rule of Criminal Procedure 12(b)(3)(A).[31]  See Jones, 52 F.3d at 927.  Rule 12(b) requires that the defense be raised by pretrial motion. Id. at 927 n.5. If the defendant fails to raise the defense before trial, he waives the

---

[31]  Federal Rule of Criminal Procedure 12(b)(3)(A) provides:
(b) Pretrial Motions.
(3) Motions That Must Be Made Before Trial.  The following must be raised before trial:
(A) a motion alleging a defect in the instituting the prosecution.

33

defense. Id.; Fed. R. Crim. Pro. 12(e).[32] Waiver may be excused, though, if the defendant shows cause for his delay in presenting the defense. Fed. R. Crim. Pro. 12(e).

Scrushy did not raise his selective prosecution defense prior to trial, as required by Rule 12(b). Instead, he waited until June 26, 2009, to raise it, in his motion for a new trial. The delay should be excused, he says, because his attorneys "did not have a good faith basis to file a selective prosecution claim prior to trial." Appellant's Initial Brief at 48. It was not until June 2009 that they acquired evidence to support the claim.

Scrushy relies in large part on two investigations into allegations of politically motivated prosecutions that were ongoing when counsel filed the motion for a new trial, one by the House of Representatives Committee on the Judiciary, another by the Department of Justice Office of Professional Responsibility. Although, as Judge Fuller noted, "many of the more detailed factual allegations recited by the [Committee on the Judiciary] report . . . could not have been known to Scrushy prior to trial, the materials provided to the Committee

---

[32] When United States v. Jones, 52 F.3d 924 (11th Cir. 1995), was decided, the waiver provision was contained in Federal Rule of Criminal Procedure 12(f). The waiver provision is now contained in Federal Rule of Criminal Procedure 12(e), which provides:

(e) Waiver of a Defense, Objection, or Request. A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides. For good cause, the court may grant relief from waiver.

on the Judiciary . . . coupled with the evidentiary attachments to Scrushy's motion, show that Scrushy had knowledge of, and co-defendant Siegelman was claiming . . . selective prosecution . . . as early as three years prior to the commencement of trial in this case." United States v. Scrushy, 2012 WL 204159, at *3 (M.D. Ala. Jan. 24, 2012).   Scrushy's excuse for the delay in presenting his claim of selective prosecution is feeble at best.  Judge Fuller acted well within his discretion in rejecting ground (1) of  Scrushy's motion for a new trial.

2.

On December 28, 2006, Scrushy moved the District Court to reconsider its December 13, 2006, order denying his motion for a new trial or, alternatively, grant a new trial based on newly discovered evidence.  The newly discovered evidence consisted of the two juror emails defense counsel and the jurors' co-workers had received in envelopes postmarked December 20, 2006.  Scrushy added to this evidence the juror email he and his counsel received on February 21, 2007.  Judge Fuller denied both motions on June 22, 2007, and this court affirmed his rulings in Siegelman I.

Ground (2) of Scrushy's  June 26, 2009, motion for a new trial is the same ground Scrushy advanced in his December 28, 2006, motion for a new trial. Ground (2) is foreclosed for two reasons: (1) the three emails do not constitute

35

newly discovered evidence; and (2) the law of the case doctrine bars its relitigation.

3.

Although newly discovered evidence of judicial misconduct could, depending on the circumstances, give rise to a motion for new trial under Rule 33, Scrushy fails to explain why the misconduct he describes in ground (3)—Judge Fuller's ex parte meeting with the Marshals—amounted to one of those circumstances requiring a new trial. The why is apparently this: the meeting took place without advance notice to defense counsel about the meeting, its purpose, and counsel's right to be present. This, according to Scrushy, denied him of his Sixth Amendment right to counsel and his Fifth Amendment due process right to fair notice.

Judge Hinkle, in entertaining Scrushy's motion to recuse, was aware of Scrushy's claim that Judge Fuller met with the Marshals ex parte in derogation of his Fifth and Sixth Amendment rights. Implicit in Judge Hinkle's finding that Judge Fuller conducted himself appropriately—just as any district judge would under similar circumstances—in meeting with the Marshals as he did is the notion that his conduct did not infringe any of Scrushy's rights as a litigant before the court. We have affirmed Judge Hinkle's decision, and we conclude that his ruling effectively disposes of ground (3) of Scrushy's motion for a new trial.

36

4.

Scrushy's fourth ground, that U.S. Attorney Leura Canary failed to abide by her decision to recuse and thereby deprived Scrushy of his right to a disinterested prosecutor, is devoid of merit. U.S. Attorney Canary recused while Scrushy and Siegelman were being investigated, after Siegelman's attorney wrote to the Deputy Attorney General and the Director of the Executive Office for the United States Attorneys requesting her disqualification. Acting U.S. Attorney Louis Franklin was appointed to oversee the case.

As evidence of Canary's continued involvement in the case, Scrushy offered emails and statements provided by a whistleblower in the U.S. Attorney's office, Tamarah Grimes, indicating that Canary had kept up with the case and contributed to litigation strategy. One email, in which Canary forwarded an email sent by Siegelman's campaign to supporters, said:

> Heaven only knows how I got on this email list. Y'all need to read because he refers to a "survey" which allegedly shows that 67% of Alabamians believe the investigation of him to be politically motivated. (Perhaps grounds not to let him discuss court activities in the media?) He also admits to making "bad" hires in his last administration. Also, it shows that it was sent last Thursday night, though I didn't receive it until late Friday. Leura.

Record, vol. II, no. 953, at 18. In a second email, Canary forwarded a letter to the editor claiming that the grand jury in the Siegelman investigation seemed to be convening in response to Siegelman's political campaign. A third email, sent by an Assistant U.S. Attorney, discusses Grimes's assignment to the case and says,

37

"Leura and Louis both liked the concept." Record, vol. II, no. 953, at 19. Grimes also stated in a letter to Attorney General Eric Holder that "Mrs. Canary publically [sic] stated that she had maintained a 'firewall' between herself and The Big Case. In reality, there was no 'firewall.' Mrs. Canary maintained direct communication with the prosecution team, directed some action in the case, and monitored the case through members of the prosecution team and [assistant U.S. Attorney] Mrs. Watson." Record, vol. II, no. 953, at 19.

Scrushy frames his claim about Canary's limited involvement with his case as a deprivation of a disinterested prosecutor. Scrushy relies on the Supreme Court's decision in Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), which held that appointment of an interested prosecutor was a structural defect requiring reversal of a conviction without a showing of prejudice. As the District Court pointed out, however, in Young, counsel for a party that was the beneficiary of a court order was the same counsel appointed to prosecute in a contempt action alleging violation of that order. Such a clear conflict of interest does not exist in this case. Canary recused herself voluntarily before Scrushy was indicted, even though the Department of Justice had found that no actual conflicts of interest existed. Another prosecutor, Assistant U. S. Attorney Louis Franklin, was appointed to oversee the case. Scrushy makes no allegation that Franklin had any conflict of interest. Moreover, there is no

38

evidence that Canary's emails influenced any decisions made by the U.S. Attorney's office in prosecuting Scrushy. Canary's limited involvement in his case did not deprive Scrushy of a disinterested prosecutor. In fine, Judge Fuller did not abuse his discretion in rejecting ground (4) of Scrushy's motion.

5.

Finally, in ground (5), Scrushy claims the prosecution engaged in misconduct in failing to inform him of a juror's infatuation with an FBI agent. His claim is based on emails sent between Assistant U.S. Attorney Patricia Watson and Grimes, the whistleblower, indicating that jurors sent messages through the Marshals expressing romantic interest in the FBI Special Agent who sat at or near the prosecution table during the trial. Watson wrote, "I just saw Keith [the FBI Special Agent] in the hall. The jurors kept sending out messages through the marshals. A couple of them wanted to know if he was married." Record, vol. II, no. 953, at 22. Grimes wrote back, "Yeah, that's what Vallie [another member of the prosecution] said. He said one girl was a gymnast and they called her 'Flipper,' because she apparently did back flips to entertain the jurors. Flipper was very interested in Keith." Record, vol. II, no. 953, at 22. Scrushy argues that the prosecution's failure to disclose the jurors' romantic interest in the FBI Special Agent was prosecutorial misconduct because the communication "raises a real possibility of bias having infected the jury." Record, vol. II, no. 953, at 60.

39

Although evidence that goes to prosecutorial misconduct or the impartiality of the jury may be the proper subject of a motion for new trial based on newly discovered evidence, this claim fails on the merits. [33] The evidence—that jurors had a romantic interest in the FBI agent and expressed that interest in notes sent through the Marshals—is not material; nor would it be likely to produce an acquittal on retrial. The assertion that a mere expression of attraction would infect the jury's decision with bias strains credulity. It was not misconduct for the prosecution to fail to disclose this contact to the defense. Even if the contact should have been disclosed, the failure to do so was harmless. Judge Fuller did not abuse his discretion in rejecting ground (5).

## IV.

For the reasons we have advanced in Part III, supra, the judgment of the District Court is

AFFIRMED.

---

[33] Judge Fuller's opinion appears to presume that the juror contacts forming the basis of the claim are the jurors' emails that were addressed in the first motion for new trial and motion for reconsideration: "These claims have been exhaustively addressed by this court, Judge Hinkle, and the Eleventh Circuit." Record, vol. IV, no. 1072, at 17. Although Scrushy's claim involves different juror contacts that have not yet been considered, we find the claim frivolous and therefore see no need to remand the issue for determination by the District Court.

40