[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10588
Non-Argument Calendar
_____

D.C. Docket No. 5:16-cr-00003-RH-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY BERNARD GILMORE,
LEWIS JONES, III,

Defendants-Appellants,

MICHAEL BERNARD GILMORE,

Defendant.

_____

No. 18-11767
Non-Argument Calendar
_____

D.C. Docket No. 5:16-cr-00003-RH-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY BERNARD GILMORE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(November 2, 2020)

Before JORDAN, JILL PRYOR and NEWSOM, Circuit Judges.

PER CURIAM:

Larry Gilmore[1] and Lewis Jones, III, challenge their convictions, following

a jury trial, for two counts of Hobbs Act robbery and two counts of brandishing a

firearm in furtherance of a crime of violence (Hobbs Act robbery and conspiracy to

commit Hobbs Act robbery).  For the reasons that follow, we affirm in part, reverse

in part, and remand this case for further proceedings consistent with this opinion.

---

[1] Gilmore's codefendant and brother, Michael Gilmore, also appealed his convictions.
After filing his merits brief on appeal, Michael Gilmore died.  His appeal has been dismissed and
remanded to the district court with instructions to dismiss the indictment against him.  In this
opinion we refer to Larry Gilmore as "Gilmore" and Michael Gilmore as "Michael Gilmore."
Where relevant, we refer to them collectively as the Gilmore brothers.

2

## I.    BACKGROUND

A grand jury returned a four-count indictment against Gilmore, Jones, and two codefendants, Michael Gilmore and Abigail Kemp, charging all four defendants with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); brandishing a firearm in furtherance of a crime of violence (the Count 1 offense), in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 2); Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); and brandishing a firearm in furtherance of a crime of violence (the Count 3 offense), in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 4).  The charges stemmed from a string of jewelry store robberies committed throughout the Southeast in 2015 and 2016.

Before trial, the defendants moved to dismiss Counts 2 and 4, arguing that the predicate offenses, conspiracy to commit Hobbs Act robbery and Hobbs Act robbery, did not qualify as "crimes of violence" within the meaning of § 924(c). The district court denied the defendants' motions.  A month later, Kemp pled guilty.

At trial, employees from six jewelry stores testified about the robberies they witnessed.  Local and federal agents testified about their investigations.  And Kemp testified for the government.  Kemp testified that she met Jones and the

3

Gilmore brothers at a restaurant where she worked. The four became friends. Then, all four became involved in a string of jewelry store robberies.

The first was a Jared Vault jewelry store in Woodstock, Georgia, in April 2015. A few days before the robbery, Jones visited the store. On the morning of the robbery, the Gilmore brothers drove or sat around the perimeter of the store as lookouts. Kemp walked into the store to "make the employees feel comfortable," Doc. 205 at 20[2]; she said she was looking for a watch. Then Jones entered the store. The employee who assisted Jones noticed that he had an earpiece in his ear; she could hear a man's voice emanating from it. Kemp testified that it was Gilmore on the phone and that Jones "kept saying [to Gilmore, who was acting as lookout], 'Am I good; am I good?'" Doc. 205 at 25.

After the employee helped him select several items of merchandise, Jones pointed a black and silver handgun at her and ordered her and a coworker to the back of the store. On the way, Jones instructed Kemp to lie down. Once in the back room of the store, Jones took keys from one of the employees. He ordered the two employees into the bathroom adjacent to the back room and told them to lie face down on the floor; he then zip-tied their hands behind their backs. Jones stole jewelry from the jewelry cases and told Kemp to get up and leave the store. Kemp left, followed by Jones. The two met up with the Gilmore brothers. Jones

_____

[2] "Doc." numbers refer to the district court's docket entries.

"handed them the bag of jewelry" and then drove Kemp home.  Doc. 205 at 26.
About a month later, Gilmore paid Kemp $2,000 to $3,000 in cash for her role in
the robbery.

Jones then asked Kemp, whom the group believed would be less
intimidating to jewelry store employees, to commit a robbery.  She agreed.  The
three men trained Kemp on how to hold a gun and what to say to store employees.
They provided her with disguises.  They told her that if an employee fought back,
"just to let them know, that they would handle it," which Kemp took to mean "that
they would maybe come in and shoot."  Doc. 205 at 39–40.  They "told [Kemp]
once that they would shoot at the police" if law enforcement showed up.  *Id.* at 41.
All three men were "[a]lways" carrying weapons:  all silver and black handguns.
*Id.*  Gilmore's was distinct in that it "had a laser pointer on it."  *Id.*

Kemp and her codefendants committed five robberies in Florida, Georgia,
South Carolina, Tennessee, and North Carolina in a manner similar to the
Woodstock robbery:  Kemp entered a store and asked for help looking for an item.
When an employee came to help, Kemp pulled a gun on the employee[3] and forced
everyone to a back room, where she zip-tied their hands and then robbed the store.
All the while, Jones was "in [her] ear talking [her] through it."  Doc. 205 at 35.

---

[3] Kemp used a black and silver handgun that Jones gave her for the first two robberies and a black handgun that she bought for the last two.  Both guns were found at Kemp's apartment.

5

The Gilmore brothers were "look[ing] out [to] see if any cops [were] coming or [if there was] any suspicious activity." *Id.* at 41. Employees, surveillance videos, and investigators also placed Jones and Gilmore at or near the scene of the five robberies.

An example of the defendants' modus operandi is the robbery of Reeds Jewelers in Panama City, Florida, on August 11, 2015. Gina Murphy was working at the store when Kemp robbed it that day. Murphy also was present the day before and saw Kemp looking at watches. That day, Kemp was wearing cell phone earbuds and, unbeknownst to Murphy, was talking on the phone to Jones. Kemp testified that her codefendants had wanted her to rob the store that day, but she balked when she saw what she believed to be high definition security surveillance trained on her while she browsed the store. Gilmore convinced her to go through with the robbery the next day by suggesting that the footage of herself she observed "wasn't a recording." Doc. 205 at 52. The government introduced into evidence photographs showing Jones and Gilmore with Kemp in Panama City the night before the robbery.

The next morning—the morning of the robbery—Kemp and her codefendants surveilled the store before she went inside, Kemp and Jones from her car and the Gilmore brothers from a separate car. When Kemp returned to the store, Murphy began helping her look at more watches. Kemp said she wanted the

opinion of another associate, so Murphy called her coworker over. The store was otherwise empty, and the front door was propped open. Kemp selected a watch and Murphy began processing the sale. Kemp reached into her purse, but instead of removing her wallet she removed a black and silver handgun—the same gun Jones had used to rob the Woodstock store. She pointed the gun at Murphy, ordered her to be quiet and put her keys down, and then ordered Murphy and her coworker to the bathroom in the back of the store.

As the three walked to the bathroom, Murphy heard the store's door chime, indicating that it was closing. Kemp testified that Jones had closed the door, and surveillance video corroborated her testimony. Kemp ordered the two employees to lie down on the bathroom floor and then zip-tied their wrists together. Kemp returned to the showroom floor, and Murphy heard her use the keys to open display cases. Murphy also heard Kemp speaking but heard no one else in the store— Kemp again was on the phone with Jones. The jury saw a surveillance video of the store, which showed Kemp walking out of the store adjusting her cell phone earbuds. Count 3 of the indictment was the August 11 Reeds Jewelers robbery. Count 4 was the brandishing of the gun at that robbery.

After the robbery, Kemp met up with Jones and the Gilmore brothers. She understood that the men then traveled to Miami, Florida, where they met up with

one of Gilmore's connections to sell the jewelry. Later, Jones paid Kemp about $10,000 in cash.

Eventually, the Federal Bureau of Investigation ("FBI"), assisted by local authorities in Panama City, gathered enough evidence against Kemp to obtain an arrest warrant. When FBI agents arrived at Kemp's apartment to execute the arrest warrant, they saw Jones pull up in a black minivan and enter the apartment. After entering the apartment and detaining Kemp and Jones, agents searched the apartment and recovered a black and silver handgun, a second all-black handgun, and ammunition. Both guns were consistent in appearance with handguns used during the robberies. *See supra* n.3.

After her arrest, Kemp implicated her codefendants in the robberies. Agents arrested Gilmore and searched his home, where they found several firearms, including a black and silver handgun with a laser, receipts for hotels (including one for Miami, Florida), business cards for jewelry stores, jewelry, and cell phones.

Agents found other connections between Kemp and the three men and testified about those connections at trial. For example, a DNA analysis revealed that Jones's DNA was on the black and silver handgun found in Kemp's apartment. A search of the minivan Jones drove to Kemp's apartment the day of their arrest revealed a rental agreement for the van in Michael Gilmore's name. The minivan also contained a receipt from a North Carolina Walmart dated the day

of the North Carolina robbery, showing a purchase for a ski band, which Kemp wore during that robbery.  Surveillance photographs from the Walmart showed Gilmore purchasing the gloves and headband and then entering a dark colored minivan.  Kemp testified that Gilmore had purchased the disguise for the North Carolina robbery.  The clothes Gilmore wore to Walmart that day–white flip flops, a gray sweatshirt, and a gray cap—were found in the black minivan.

An FBI agent obtained cell phone records for the defendants.  Michael Gilmore was listed as the subscriber for his and Jones's phones.  Cell tower information placed Michael and Larry Gilmore near every robbery and all four codefendants near all five robberies Kemp committed.  During these times the codefendants' phones were in frequent contact with each other.  For example, on the date of the South Carolina robbery, Jones called Kemp two minutes before the robbery and remained on the phone with her for eight minutes.  Seven seconds after he hung up with Kemp, Jones called Michael Gilmore and remained on the phone for eight minutes.

A forensic examiner for the FBI extracted data from Gilmore's cell phone and found several photos of diamond rings and bracelets, some with price tags on them.  The photos of jewelry with price tags on them were taken a few hours after the Woodstock robbery, and SKU numbers from the tags matched those in the inventory of stolen items from the Woodstock store.  Gilmore's phone contained a

video dated a day after the Woodstock robbery showing Gilmore giving his wife a set of diamond rings. The FBI forensic examiner also testified that Gilmore's financial records showed that his wife made multiple cash deposits around the times of the robberies.

During Kemp's testimony, defense counsel asked whether she had "ever participate[d] in a robbery in the Buckhead area in Atlanta" before the jewelry store robberies. Doc. 205 at 174. Kemp denied that she had.

The jury found Jones and Gilmore guilty on all four counts. The district court sentenced Jones and Gilmore to a total of 384 months' imprisonment for each defendant. This represented a sentence of one day of imprisonment on Counts 1 and 3, to be served concurrently with 84 months' imprisonment for Count 2, which was consecutive to 300 months' imprisonment for Count 4.

After sentencing, Jones—proceeding *pro se*—and Gilmore—proceeding with counsel—filed motions for a new trial, their second such motions and the only ones at issue in this appeal. In their motions, which are nearly identical in substance, Gilmore and Jones argued that they discovered Kemp had testified untruthfully at trial when she denied she had committed a robbery in the Buckhead neighborhood of Atlanta. They asserted that Crime Stoppers photographs indicated that Kemp and Jones were wanted for two grocery store robberies in Buckhead that took place in early 2015.

The district court denied the motions. The court first emphasized that Gilmore and Jones had failed to explain how Kemp's participation in the robberies could have been unknown to Jones or exculpatory for either defendant given their "close cooperation" with one another. Doc. 330 at 3. Second, the court determined that the evidence "would have been primarily if not entirely impeaching," and therefore improper grounds for a new trial, noting that Gilmore and Jones had themselves "assert[ed] the evidence would have undermined Ms. Kemp's credibility." *Id.* at 4. Third, the court found that "the evidence was barely material, if material at all." *Id.* That is because Kemp's participation in an earlier grocery store robbery "tells one nothing" about whether she participated in the jewelry store robbery or needed training on how to participate in one. *Id.* Fourth, the court found that the government had presented overwhelming evidence of the defendants' guilt, so evidence about Kemp's participation in an earlier robbery "would not have helped" Jones or Gilmore. *Id.* Even if Kemp lied about her participation in an earlier robbery, "this would have been a small drop in a large bucket" given that Kemp's testimony about her role in the robberies was detailed and corroborated. *Id.* at 5.

Gilmore and Jones have appealed.

## II.    STANDARDS OF REVIEW

11

We review questions of constitutional law and statutory construction *de novo*. *United States v. Whatley*, 719 F.3d 1206, 1213 (11th Cir. 2013) (constitutional questions); *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1383 (11th Cir. 2011) (statutory construction). "A district court's designation of an offense as a crime of violence is a question of law subject to *de novo* review." *United States v. Bates*, 960 F.3d 1278, 1285 (11th Cir. 2020). Under our prior panel precedent rule, a panel is bound by a prior panel's decision until overruled by the Supreme Court or by this Court *en banc*. *United States v. Steele*, 147 F.3d 1316, 1317-18 (11th Cir. 1998).

We review a district court's denial of a motion for new trial for an abuse of discretion. *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013). "A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous." *Id.* (internal quotation marks omitted).

### III.   DISCUSSION

The arguments we must address in this appeal are: [4] (1) whether the district court erred by concluding that Hobbs Act robbery and conspiracy to commit

---

[4] Gilmore's and Jones's appellate briefs both contain an adoption statement pursuant to Federal Rule of Appellate Procedure 28(i). Each appellant seeks to adopt the arguments made by their co-appellants. However, the only arguments that we allow both Gilmore and Jones to adopt

Hobbs Act robbery qualified as crimes of violence; and (2) whether the district court abused its discretion in denying Gilmore and Jones's second motions for a new trial based on newly discovered evidence.

## A. Section 924(c) Convictions

Gilmore and Jones challenge their 18 U.S.C. § 924(c) convictions, one of which was predicated on Hobbs Act robbery and one of which was predicated on conspiracy to commit Hobbs Act robbery. We affirm the convictions predicated on the former but reverse the convictions predicated on the latter.

Section 924(c) criminalizes the use or carrying of a firearm during and in relation to a "crime of violence" or drug trafficking crime. 18 U.S.C. § 924(c); *see*

---

are those pertaining to the issues of whether Hobbs Act robbery and conspiracy to commit Hobbs Act robbery are crimes of violence under § 924(c), as the relevant facts and their legal significance are common to all defendants. *See United States v. Khoury*, 901 F.2d 948, 963 n.14 (11th Cir. 1990).

Jones and Gilmore also seek to adopt Michael Gilmore's challenge to the sufficiency of the evidence on the Count 1 conspiracy. Due to the fact-specific nature of this case and the different roles each defendant played in the conspiracy, independent briefing would be required for us to reach the merits of a sufficiency-of-the-evidence argument pertaining to Gilmore and Jones. We therefore decline to allow them to adopt their co-defendant's sufficiency-of-the evidence challenge. *See id.*

Finally, Jones and Gilmore seek to adopt Michael Gilmore's challenge to the district court's denial of their "nearly identical," Doc. 330 at 2, second motions for new trial based on newly discovered evidence. We do not permit Gilmore to adopt Michael Gilmore's brief as it pertains to the second motion for a new trial. Michael Gilmore's challenge to the district court's denial of that motion was based on the fact that he filed his motion *pro se*. Gilmore's motion was counseled. In an abundance of caution, we permit Jones to adopt Michael Gilmore's challenge. Jones, like Michael Gilmore, filed the motion *pro se*. And although Jones filed a separate appeal challenging the district court's order denying his motion for new trial that was dismissed for failure to prosecute, his notice of appeal in this case arguably encompasses the district court's order on the motion for new trial, which could explain his failure to prosecute the other appeal.

13

*id.* § 924(c)(1)(A)(ii) (imposing an enhanced sentence "if the firearm is brandished," as it was here).  At the time of trial, "crime of violence" had two definitions:  a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or one that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(A)–(B).  The first definition is called the "elements clause" and the latter was known as the "residual clause."  *United States v. Davis*, 139 S. Ct. 2319, 2324 (2019).

In *Davis v. United States*, the Supreme Court held that the residual clause of § 924(c) was unconstitutionally vague.  139 S. Ct. 2319, 2324–25, 2336 (2019).  Thus, unless an offense is a crime of violence under the elements clause, or is a drug trafficking crime, it does not qualify as a § 924(c) predicate offense.  Neither Hobbs Act robbery nor conspiracy to commit Hobbs Act robbery is a drug trafficking crime, so these crimes can qualify only under the remaining crime of violence definition.

As Gilmore and Jones acknowledge, this Court has held that Hobbs Act robbery categorically satisfies § 924(c)'s elements clause.  *St. Hubert*, 909 F.3d at 345-46.  We are bound to follow *St. Hubert*, *see Steele*, 147 F.3d at 1317–18, and therefore affirm Gilmore's and Jones's Count 4 convictions, which rest on Hobbs

Act robbery.[5]  Their convictions predicated on conspiracy to commit Hobbs Act

robbery, however, are a different story.  We recently held that conspiracy to

commit Hobbs Act robbery does not qualify as a crime of violence under

§ 924(c)'s elements clause.  *Brown v. United States*, 942 F.3d 1069, 1075–76 (11th

Cir. 2019).  We therefore vacate Gilmore's and Jones's § 924(c) Count 2

convictions, which rest on conspiracy to commit Hobbs Act robbery.

## B.  Motion for New Trial

Gilmore and Jones next challenge the district court's denial of their second

motions for new trial.  We reject their challenge.

A defendant may file a motion for a new trial "grounded on newly

discovered evidence," and the district court "may vacate [the] judgment and grant a

new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a), (b)(1).

Although "motions for a new trial are highly disfavored" and "should be granted

only with great caution," evidence "that would afford reasonable grounds to

question the integrity of the verdict" may be grounds for a new trial based on

newly discovered evidence.  *Scrushy*, 721 F.3d at 1304 (internal quotation marks

---

[5] Before the Supreme Court decided *Davis*, this Court upheld § 924(c)'s residual clause by directing courts to determine whether the defendant's conduct satisfied the residual clause definition.  *See Ovalles v. United States*, 905 F.3d 1231 (11th Cir. 2018) (en banc), *abrogated by Davis v. United States*, 139 S. Ct. 2319 (1019).  Jones and Gilbert argue that the district court should have submitted to the jury the question of whether they committed a crime of violence. *Davis*, however, rejected *Ovalles*'s conduct-based approach.  *See Davis*, 139 S. Ct. at 2327–36.

omitted).  Newly discovered evidence "need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of law." *Id*. (internal quotation marks omitted).

To obtain a new trial based on newly discovered evidence, "a movant must satisfy four elements: (1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it would probably produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of due diligence on the part of the defendant."  *Id*. at 1304–05 (citing Fed. R. Crim. P. 33(b)(1)).  "Failure to satisfy any one of those elements is fatal to a motion for new trial."  *United States v. Taohim*, 817 F.3d 1215, 1223 (11th Cir. 2013).

The district court was within its discretion to conclude that Gilmore and Jones failed to satisfy Rule 33.  Most importantly, the district court was within its discretion to find that the evidence was not so compelling that it would probably produce an acquittal.  Kemp's testimony against her codefendants undoubtedly was important, but it also was extensively corroborated with testimonial and documentary evidence.  This includes testimony from jewelry store employees who witnessed the robberies; local law enforcement and federal agents who investigated the robberies, arrested the defendants, and searched the defendants'

16

residences; and an FBI forensics examiner.  The government introduced

surveillance photographs and video, as well as text communications, photographs

and videos from the defendants' cell phones.  The government also introduced the

physical evidence, including handguns, recovered from their searches.  As the

district court explained, the evidence against the defendants in this case was

overwhelming.  Thus, even if Kemp lied about her involvement in a robbery in

Buckhead, exposure of the lie would not have so undermined her independently-

corroborated testimony about the jewelry store robberies that it probably would

have led to an acquittal.

Jones argues that the district court misconstrued the argument he made in his

motion for new trial.  Specifically, he argues that because he proceeded *pro se* on

that motion, the district court should have liberally construed his motion as

advancing a *Giglio* or *Brady*[6] violation rather than an argument that should be

analyzed under Rule 33.  Even if the district court should have applied *Brady*,

Jones's motion was due to be denied.  Claims under *Brady* or *Giglio* can succeed

only upon a showing of prejudice.  *See United States v. Vallejo*, 297 F.3d 1154,

1164 (11th Cir. 2002) ("To establish a *Brady* violation, the defendant must show

that . . . had the evidence been disclosed to the defendant, there is a reasonable

probability that the outcome would have been different."); *United States v.*

---

[6] *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

*Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001) ("A successful *Giglio* challenge requires the defendant to establish that . . . the falsehood was material. The materiality element is satisfied if the false testimony could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (citation and internal quotation marks omitted)). As we have explained, the government introduced overwhelming evidence of Jones's guilt in the robberies for which he was tried; thus, he cannot show prejudice.

We discern no reversible error in the district court's denial of Gilmore's and Jones's second motions for new trial.

## IV.    CONCLUSION

For the foregoing reasons, we vacate Jones's and Gilmore's Count 2 convictions. In all other respects, we affirm.

**AFFIRMED IN PART, VACATED IN PART, REMANDED.**