[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12406

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JONG SUNG KIM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:13-cr-00379-TCB-AJB-3

_____

Before LUCK, BRASHER, and ANDERSON, Circuit Judges.

PER CURIAM:

Jong Sung "John" Kim appeals the district court's denial of his motion for a new trial based on new evidence that the government failed to disclose. Kim claims that the failure to disclose violated *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), requiring a new trial. He also argues that the district court abused its discretion in denying his requests for a new trial and for discovery and an evidentiary hearing into the nondisclosure. Because the failure to disclose was not a *Brady* or *Giglio* violation and the district court didn't abuse its discretion in denying the requests for a new trial, discovery, and a hearing, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We described the facts and procedural history of this case when we affirmed Kim's convictions. *United States v. Kim*, 823 F. App'x 804 (11th Cir. 2020). Kim was charged with one count of conspiracy to commit Hobbs Act extortion and three counts of aiding and abetting in Hobbs Act extortion—on December 16, 2009, and January 13 and 21, 2010—in violation of 18 U.S.C. section 1951(a). *Id.* at 805–06. Ultimately, the jury acquitted Kim of the conspiracy count and the December 2009 count and convicted him of the January 2010 counts. *Id.* at 806.

Kim was part of a "protection" scheme run by Yoo Jin "Eugene" Chung. *Id.* In July 2009, Chung, Kim, and others "demanded a monthly share of the profits of" the Gah Bin Korean bar and restaurant from the owner, Yoon Soo Lee, in exchange for Chung's promise "to refrain from, and to deter others from, physically assaulting [Lee], harassing his customers and employees, and damaging the business." *Id.* Lee started making monthly protection payments right away. *Id.*

After Lee missed a payment, Chung, Kim, and three others visited him at Gah Bin on December 16, 2009. *Id.* Chung pointed a gun at Lee's head and threatened to kill him; another member of the group punched Lee in the face, breaking his nose; and then Chung pistol-whipped Lee in the head, knocking him out. *Id.* When Lee regained consciousness, Kim told him to pay Chung. *Id.*

After the attack, Lee cooperated with the Federal Bureau of Investigation to set up and record two meetings between Lee and Kim at Gah Bin, on January 13 and 21, 2010, during which Lee paid Kim five hundred dollars. *Id.* The Bureau also recorded phone calls between Lee and Kim. *Id.*

At trial, Lee "testified about the protection-payment arrangement," the December 2009 attack, and his cooperation with the Bureau. *Id.* The government admitted the transcripts and translations of the recorded phone calls into evidence. *Id.* Other witnesses testified about the December 2009 attack, the close relationship between Chung and Kim, and their history of "beat[ing] up people to collect debts" and "caus[ing] trouble for Lee . . . at

other businesses he operated" by "refusing to pay tabs and causing property damage." *Id.* at 807–08. We found that "overwhelming" evidence supported Kim's convictions. *Id.* at 814.

Kim's defense theory was that the December 2009 attack was just a drunken bar fight, that he collected the two payments in January 2010 because he believed they were for a legitimate business debt that Lee owed to Chung, and that the government entrapped Kim into collecting the payments. *Id.* at 808. Kim requested the pattern jury instruction on entrapment, and the district court denied the request. *Id.* We affirmed the denial because Kim was extorting Lee before Lee started cooperating with the Bureau. *Id.* at 813.

In 2019—after Kim's trial and conviction—the Bureau reviewed calls on a recording system it was no longer going to use and found five recorded phone conversations between Lee and Kim that had not been previously disclosed. The calls were translated from Korean to English. The fifth call, made January 26, 2010, consisted solely of some clicking sounds and Lee saying, "Hello?" The other four calls, made January 9, 16, 21 (A.M.), and 21 (P.M.), are the focus of this appeal.

The January 9, 2010 call was the longest. At the beginning of the call, Kim declined Lee's offer that Kim and two others (a carpenter who worked on Kim's church and the carpenter's associate) drink for free at Gah Bin. According to Kim, he "no longer want[ed]" to drink for free "starting 2010." Then, Lee and Kim discussed other people, including someone named Chul An who was

causing problems for Lee.  Kim told Lee that Lee "should relax and come and go" as Lee pleased, and that Kim considered Lee a "younger brother" and Lee should consider Kim an "[o]lder brother."

Lee told Kim that he gave money intended for Chung to one of Chung's associates, and because that associate "took the money and spent it" instead of giving it to Chung, Chung "came with many" associates and "did bad things to" Lee.  Kim confirmed that what Lee was saying was "correct."  Lee told Kim that Lee was "not going to the bar these days" because of his injuries.  They talked about the injuries to Lee's nose, eyes, and head, the pain he was in, and his "fumbling on words."  Lee said that "it was [a] big shock for [him] this time" because two weeks after Chung "put a gun on" him, Chul An came in.

Lee complained that Chul An would make things "more difficult" for him if Chul An "ma[d]e noise in the bar" and scared away the customers.  Kim asked, "Should I say that you and I . . . are working together?"  Lee responded, "They won't believe it."  And Kim said, "No.  They all know that I want to run a bar right now."  Kim said that there was "[n]o need to tell about receiving money" and that Lee should just say that Kim "invested [in] girls" at Gah Bin.  Lee responded, "They will not believe that."  Kim shared his concern for the potential damage to Lee's reputation.

Lee said, "Back then[,] there weren't any issues when I was giving [Chung] $500 each time at the bar," and Kim said, "Let's do that way."  Lee said, "I am just asking you not to make it too loud.

I don't want to get beat up or have problem with someone any-more," and Kim said, "OK." Lee said, "So I just need to do like that then?", and Kim said, "Right." Kim agreed to let Lee know if Chul An was "planning on doing something to" Lee. Lee and Kim coordinated when Kim could come to the shop to see Lee. Lee told Kim, "Come . . . someday when I tell you to." Lee said, "I am just going to give $500 each week," and Kim said, "Yeah." Lee said, "Just don't let me get damaged. Don't make it noisy," and Kim said, "Yeah OK."

To explain why Chung couldn't "tell his mom everything," Kim told Lee, "[A] few days ago [Chung]'s mother asked, 'Who? Who?' His mother was upset and cursed out and asked me, 'Which bad rat swindled my son's money?'"

The January 16 call began with Kim's request that Lee help him—with Lee's "ability" and "ideas," "not money help"—because Kim "want[ed] to do Yulbup," a business like Gah Bin. Lee segued to a discussion of Chul An. Then, Lee promised to pay Chung and Kim so there would be "no more injury and no more damage." Kim said he would "look into" the situation with Chul An. Lee asked, "You split $500 between [Chung] and you? $250 each?" Kim responded, "No, jerk. What are you talking about! So I said, 'What are you saying?' and [Chung] said[,] 'No[,] I was just joking brother[,]' and closed the window when he was talking to you on the phone when I was giving him the money." As before, Lee mentioned his injuries, pain, and shock. And Lee planned for Kim's

21-12406                    Opinion of the Court                    7

meeting: Lee said, "I will give you a call a day before. . . . Just come simply when I call."

During the January 21 (A.M.) call, Kim told Lee that just Kim and Chung were coming to speak with Lee directly. Lee mentioned the "last time," when he "asked Sang Jin to deliver the money to [Chung] but he gave [it] to someone else," and Kim said, "That is why I am involved. Stupid." Lee proposed that Kim come to Gah Bin a little before 9 P.M. that night, talk, drink coffee or alcohol for an hour, and leave. Kim agreed.

During the January 21 (P.M.) call, Lee told Kim that "these days," Lee went out for medical care but didn't go to the bar. Lee said that he was "not in good shape" and his chin hurt. Kim told Lee about Kim's plans to visit family and friends in Korea. Kim called Lee a "jerk" a couple times, informed Lee that he was moving soon, and suggested that Lee "call [him] sometimes" and "stay home" instead of "go[ing] out."

Kim moved for a new trial based on the newly discovered phone recordings. He argued that the government's failure to disclose the recordings violated *Brady* and *Giglio*. "[T]he undisclosed recordings were exculpatory," he contended, because they included "independent evidence of [his] lack of intent to extort" Lee, "additional evidence of government inducement" that would have supported his "request for an entrapment jury instruction," and "statements by . . . Lee . . . in direct contradiction to [Lee's] trial testimony." Besides a new trial, Kim requested an evidentiary hearing and "full discovery, including all *Brady* and *Giglio* material

on th[e] matter, including but not limited to all emails and reports which reference[d] the undisclosed recordings . . . , reflecting among other things when the government knew what." The motion was a "place[]holder . . . listing several statements which f[e]ll into th[e] inducement category, or other *Brady* / *Giglio* categories."

After we affirmed Kim's convictions, he supplemented his motion to address our decision and to add support for his arguments. In the supplemented motion, he requested "discovery on th[e] matter including production of all emails and reports which reference[d] the undisclosed audio recordings . . . , including how, when[,] and what the government learned about" the recordings; "phone records of . . . Lee possessed by the government for the relevant time period"; "all reports or emails which reveal[ed], indicate[d] or suggest[ed that] . . . Lee was not a credible witness, that he perjured himself in . . . Kim's trial, or that he submitted false statements or perjury in obtaining or attempting to obtain a 'victim visa' or other benefits from the government"; and "discovery, reports[,] and emails related to the investigation or prosecution of the law enforcement agents assigned to th[e] case, for providing improper assistance or making false statements to other law enforcement, [i]mmigration[,] or judicial officials" on Lee's behalf.

The district court denied the motion for a new trial because Kim didn't show that the absence of the four phone conversations from the trial evidence prejudiced him. The district court also denied Kim's requests for discovery and a hearing because the Bureau

21-12406                Opinion of the Court                9

had provided an affidavit from the case agent explaining how the government discovered the new recordings and because "the record contain[ed] all necessary elements to resolve the motion."

## STANDARD OF REVIEW

We review for an abuse of discretion a district court's denial of a motion for a new trial based on an alleged *Brady* or *Giglio* violation. *United States v. Stein*, 846 F.3d 1135, 1145, 1151 (11th Cir. 2017). We also review for an abuse of discretion a district court's denial of a request for discovery or for an evidentiary hearing based on an alleged *Brady* or *Giglio* violation. *Id.* at 1151. A district court abuses its discretion when it misapplies the law or makes clearly erroneous factual findings. *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013). Factual findings are clearly erroneous when they leave us "with a definite and firm conviction that a mistake has been committed." *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004).

## DISCUSSION

Kim argues that the government's failure to disclose the four January 2010 phone recordings violated *Brady* and *Giglio* and required a new trial, or, at least, discovery and an evidentiary hearing on the motion for a new trial. We discuss the alleged *Brady* and *Giglio* violations before turning to the motion for a new trial and the discovery and hearing requests.

### Brady

Kim contends that the government's failure to disclose the recordings violated *Brady* because, "had the evidence been disclosed, Kim would have been better armed to cross-examine" Lee—"the government's star witness"—and to prove that Kim "lacked criminal intent to commit extortion." The recordings, Kim says, showed that Lee was paying Chung for ownership of Gah Bin, not for protection, and that Lee and Kim were peers in their relationship with similar levels of control over their dealings. According to Kim, the January 9 call showed that he lacked criminal intent because he no longer wanted to drink for free at Gah Bin, he didn't intimidate Lee through an extortionist power dynamic, and he thought Lee owed Chung a legitimate debt for the bar. During the January 16 and January 21 (P.M.) calls, Lee described the injuries that he sustained during the December 2009 attack as minimal, and these descriptions, Kim argues, contradicted Lee's trial testimony about the injuries' seriousness. And Kim asserts that both January 21 calls showed his lack of intent and supported an entrapment instruction because during the calls, Lee "play[ed] upon" Kim's sympathies by complaining about his injuries and told Kim that Lee needed to give Chung's money to Kim—and no one else—to ensure that Chung would get it.

Because "motions for a new trial are highly disfavored, . . . district courts should use great caution in granting a new trial motion based on newly discovered evidence." *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003) (quotations omitted).

"When a *Brady* violation occurs, a defendant is entitled to a new trial." *Scott v. United States*, 890 F.3d 1239, 1251 (11th Cir. 2018). To prove a *Brady* violation, a defendant must establish four elements: (1) "the government possessed favorable evidence to the defendant"; (2) "the defendant d[id] not possess the evidence and could not obtain the evidence with any reasonable diligence"; (3) "the prosecution suppressed the favorable evidence"; and (4) "had the evidence been disclosed to the defendant, there [wa]s a reasonable probability that the outcome would have been different." *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).

The government had the recordings and did not provide them to Kim during discovery because the Bureau was unaware of them at that time. But Kim failed to establish a reasonable probability that the outcome of his trial would have been different with the recordings.

First, far from exonerating Kim, the recordings would have further implicated him in Chung's protection scheme. During the January 9 call, Kim confirmed that Lee had fewer problems when Lee paid Chung five hundred dollars each time at Gah Bin, and Kim acknowledged that Lee didn't want the atmosphere in the bar to get too loud and Lee didn't want to get beaten up. During the January 16 call, Lee made it clear that he was paying Chung and Kim to avoid further injuries and damage to the bar. And during the January 21 (A.M.) call, Kim explained that he got involved as a go-between to ensure that the money Lee paid made it to Chung. The conversations supported Kim's guilt, not his innocence.

Second, the recordings didn't support an entrapment instruction. As we explained on direct appeal, the trial

> evidence was that Chung and his co-conspirators, including Kim, extorted money from Lee, the proprietor of the Gah Bin bar, starting in July 2009—months before the government entered the picture. . . . Because Kim was extorting Lee before the FBI got involved, Kim failed to show that the government created a substantial risk he would commit an extortion he was not ready to commit. He was ready and did extort Lee months before the FBI entered the picture. Based on the evidence, the district court correctly concluded that "[t]his is not an entrapment case."

*Kim*, 823 F. App'x at 812–13. The new recordings from January 2010—after Kim had already been extorting Lee—would not have changed our conclusion.

Third, the recordings didn't show Kim's lack of intent. That Kim and Lee were mostly civil to one another on the phone—though Kim did call Lee a "jerk" multiple times, and "stupid"—didn't change their dynamic: Lee was paying Kim for Chung's protection. Chung wanted money for himself more than free drinks for his associates, so it made sense for Kim to decline Lee's offer to drink for free. Anyway, the jury already had evidence that Kim was not interested in how Lee's arrangement with Chung could directly benefit Kim: in recorded statements, Kim said that he didn't care about the money management of Lee's dealings with Chung.

Fourth, Kim argues that the January 9 comments about Chung's mother and the "bad rat" who "swindled [her] son's money" would have supported Kim's theory that Chung sold Gah Bin to Lee after Chung was swindled by a former business partner. But the recorded comments were too vague to overcome the witness testimony and Kim's statements on the recordings—the new ones and the ones admitted at trial—that Lee was paying for protection.

And fifth, Lee's descriptions of his injuries as minor would not have affected the verdict because the jury found Kim not guilty of the December 2009 count and because, in context, the descriptions didn't contradict Lee's testimony. Because the recordings would not have given the jury new information and would have supported the original verdict, Kim has not established a *Brady* violation.

## *Giglio*

Kim asserts that the government's failure to disclose the phone recordings violated *Giglio* because the January 9 call would have supported Kim's belief that the payments from Lee to Chung were for a legitimate business debt "in direct contradiction to [Lee]'s trial testimony," "would have armed Kim's counsel with cross-examination material[,] and would have allowed the jury to see a more accurate and fair picture of . . . Kim's case." Without the recording, "Lee was allowed," Kim says, "to omit a significant portion of the truth, if not lie, about his communications with Kim leading up to the January 13, 2010, first payment."

To prove a *Giglio* violation, a defendant must show that "the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony" and that "there [wa]s any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011). "The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." *Id.*

Kim's *Giglio* argument hinges on Lee's testimony during trial. The government asked Lee if he'd had any communications with Kim before January 13, 2010, and Lee said yes. The government then asked Lee to describe the nature of the communications, and Lee responded that Kim told him to give money to Chung so "everybody w[ould] be okay." The government asked whether any communications occurred from the time Kim said to give Chung money to the time Lee paid Kim for Chung, and Lee asked for clarification on the question. There was a language barrier; Lee testified through an interpreter. Instead of pursuing the original question, the government asked whether Kim and Lee agreed to meet at a specific time and where they met on January 13. Lee answered that they did agree on a time and that they met at Gah Bin.

Kim contends that Lee testified falsely because Lee "failed to provide any information" when "asked directly about the nature of his prior conversations with Kim." But the phone recordings show

that Lee testified truthfully.  Lee communicated with Kim before January 13, Kim confirmed that paying Chung would result in fewer problems for Lee, and Kim and Lee coordinated the best time to meet at Gah Bin.  On cross-examination, Lee testified that he called Kim multiple times before January 13 to set him up.  The recordings corroborate this testimony.

Because Kim has not established that Lee testified falsely, Kim has not established a *Giglio* violation.

### *Newly Discovered Evidence*

Kim argues that the recordings were newly discovered evidence showing:  (1) that Lee's payments were for the bar and not protection; (2) the "true power dynamic" between Lee and Kim; (3) that Lee's injuries were minor; and (4) that Kim was entitled to an entrapment instruction because Lee played on Kim's sympathies.  Based on the new evidence, Kim contends that the district court erred in denying his motion for a new trial.

"To succeed on a motion for a new trial based on newly discovered evidence," a defendant must satisfy five requirements:  (1) "the evidence was discovered after trial"; (2) "the failure of the defendant to discover the evidence was not due to a lack of due diligence"; (3) "the evidence is not merely cumulative or impeaching"; (4) "the evidence is material to issues before the court"; and (5) "the evidence is such that a new trial would probably produce a different result."  *United States v. Schlei*, 122 F.3d 944, 991 (11th Cir. 1997).

For the reasons explained above, Kim has not shown an abuse of discretion. The undisclosed recordings would have supported Lee's story that he paid for protection, neither the power dynamic revealed in the calls nor the comments about Lee's injuries would have affected the verdict, and an entrapment instruction would still have been inappropriate. Even if we assume that Kim's failure to discover the calls "was not due to a lack of due diligence," Kim failed to show that the recordings were "not merely cumulative or impeaching" or that "a new trial would probably produce a different result." *Id.* The jury already had evidence supporting Kim's theory of defense, making the calls cumulative. And many of Kim's arguments focus on impeaching Lee. Moreover, the calls would have supported Kim's guilt for the January 2010 extortion counts; they would not have resulted in a different verdict.

Because the new evidence would not have produced a different result, the district court didn't abuse its discretion in denying Kim's motion for a new trial.

### Discovery and Hearing Requests

Kim contends that as a general rule, district courts should hold evidentiary hearings on motions for new trials, and if the district court had held a hearing here, Kim could have questioned Lee or the case agent about why Lee failed to inform the Bureau about his undisclosed conversations with Kim. Kim also argues—"based upon information and belief"—that the discovery request would have produced evidence that Lee perjured himself during the trial, though Kim does not explain how.

21-12406            Opinion of the Court            17

"The law of this circuit is well established that a motion for new trial may ordinarily be decided upon affidavits without an evidentiary hearing." *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). "Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession." *Id.*; *see United States v. Culliver*, 17 F.3d 349, 350–51 (11th Cir. 1994) (involving allegations of third party confession); *United States v. Gates*, 10 F.3d 765, 768 (11th Cir. 1993) (same). "[T]he acumen gained by a trial judge over the course of the proceedings ma[kes] him well qualified to rule on the basis of affidavits without a hearing." *Hamilton*, 559 F.2d at 1373–74; *accord Schlei*, 122 F.3d at 994. And a hearing is not required if the record contains "all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial." *Scrushy*, 721 F.3d at 1305 n.30.

The case agent submitted an affidavit explaining how the government discovered the undisclosed recordings. Kim contends that the affidavit was insufficient. But Kim did not—and does not—allege jury tampering, prosecutorial misconduct, third party confession, or another "unique situation[]" requiring discovery or an evidentiary hearing. *Hamilton*, 559 F.2d at 1373. Kim cites *Culliver* and *Gates* as standing for a general rule that a motion for a new trial requires an evidentiary hearing. But those cases presented the unique situation of a third party confession. This case does not. The same judge who presided over Kim's trial also denied his motion for a new trial, so he was "well qualified to rule on

18                   Opinion of the Court                   21-12406

the basis of [the agent's] affidavit[] without a hearing." *Id.* at 1373–74. The district court concluded that "an evidentiary hearing [wa]s not required because the record contain[ed] all necessary elements to resolve the motion." We agree. *See Scrushy*, 721 F.3d at 1305 n.30.

The undisclosed calls do not support that Lee perjured himself. Kim says that "good cause for discovery cannot arise from mere speculation." *See Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). But he offers us only speculation that his discovery request would have produced evidence of perjury. Because Kim's case did not present a unique situation warranting deviation from the general rule that a new trial motion may be decided based on an affidavit without discovery or a hearing, and because the acumen of the trial judge and the fullness of the record meant that discovery and a hearing were unnecessary, the district court didn't abuse its discretion when it denied Kim's requests.

## CONCLUSION

Kim did not establish a *Brady* or *Giglio* violation, and the district court did not abuse its discretion in denying his requests for a new trial, discovery, and an evidentiary hearing. Thus, we affirm.

**AFFIRMED.**